JS - 6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL JAMES O'NEILL ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> THE SHERWIN-WILLIAMS COMPANY, ) <br> ) <br> Defendant. ) <br> ) <br> ) <br> ) <br> _____ ) | CASE NO. EDCV-08-368-SGL (JCRx) <br><br> ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT JAMES CLARK (DOCKET #31) AND MALIN DOLLINGER (DOCKET #30); ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET #28) |

On several occasions between 1997 and 2002, Michael O'Neill used epoxy paint and reducer manufactured by The Sherwin-Williams Company ("Sherwin-Williams") to paint and then repaint the floor in a restaurant where he worked as a handy-man.

According to O'Neill each time he painted the floor he did so by applying three coats of paint over a three day period. Although he attempted to ventilate the area by opening all the doors and using the air conditioning system in the restaurant, he would nonetheless frequently become overwhelmed by the strong odors/fumes from the paint and reducer, forcing him to exit the premises to get some fresh air.

It is further alleged that O'Neill was not advised by the local Sherwin-Williams store where he got the epoxy paint to wear a protective mask or gloves while using the product.

There is conflicting evidence about how often O'Neill repainted the floor. O'Neill testified that he repainted the floor approximately once every three months for a total of forty times, and that each time he applied one or two coats of paint. The owner of the restaurant, however, testified that the floor was repainted only once a year, although he admitted that O'Neill may have occasionally "touched up" areas of the floor at other times.

O'Neill was later diagnosed with bladder cancer in 2006. He has since filed suit against Sherwin-Williams on claims of strict liability and negligence, contending that his cancer was caused by inhalation and dermal (i.e., skin) exposure to the "paint," in general, or alternatively, to either trace levels of benzene or to some aromatic amine compound contained in the epoxy product. To that end, O'Neill has proffered a toxicological/epidemiological expert — James Clark, Ph.D — and a medical expert — Dr. Malin Dollinger — to substantiate his theory of causation. Sherwin-Williams has since filed a motion to exclude the expert testimony, and, if granted, to have judgment entered in its favor as a matter of law.[1]

A.   *Standard for Determining the Admission of Expert Testimony*

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist a trier of fact to understand the

---

[1] Sherwin-Williams concedes that, should the Court deny its motions to exclude plaintiffs' experts, then there is no basis upon which to grant its motion for judgment as a matter of law. (Mot. Judg. Law at 3 ("If Plaintiff's experts are excluded from testifying at trial by this Court, . . . Plaintiff will be unable to meet his burden of proof as to his causes of action for negligence and strict liability") & Opp. at 4 (acknowledging that basis for motion is predicated on the contention "that Plaintiff's experts, Dr. Clark and Dr. Dollinger, should be excluded pursuant to Daubert")).

Sherwin-Williams has also moved to exclude portions of the rebuttal reports of O'Neill's experts as untimely. Given the disposition of the Daubert motions, the Court does not address the merits of that motion.

evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion . . ., if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness had applied the principles and methods reliably to the facts of the case." As the Supreme Court explained, Rule 702 tasks trial courts with acting as a gatekeeper "to ensure that any and all scientific testimony . . . is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993). To that end, Daubert articulated a two-prong test trial courts must apply in deciding the admissibility of expert testimony: (1) Whether the proffered expert testimony is based on "principles and methodology" that are "scientific" and, therefore, reliable, and (2) whether the expert's testimony is relevant by being "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[2] Id. at 591, 595.

In a toxic tort case such as this one, expert testimony on causation "is typically discussed in terms of general and specific causation." In re Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1133 (9th Cir. 2002). General causation refers to "whether the substance at issue had the capacity to cause the harm alleged," that is, could the substance at issue cause the type of harm complained about. Id. (emphasis added). Specific causation, on the other hand, concerns "whether a particular individual suffers from a particular ailment [because] of exposure to a substance," that is, did the substance actually cause the harm

---

[2] As to the former prong, Daubert identified four, non-exclusive, factors that could be relevant on the reliability of the expert evidence in question: (1) whether the theory or technique used can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error and the existence and maintenance of the standards controlling the technique used; and (4) whether the theory or technique used has been generally accepted in the relevant scientific or technical community. Id. at 593-94. Not each of the above-mentioned factors are "equally applicable (or applicable at all) in every case." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) ("Daubert II").

complained about. Id. (citing In re "Agent Orange" Prod. Liab. Litig. MDL No. 381, 818 F.2d 145, 165 (2nd Cir. 1987) ("the relevant question . . . is not whether Agent Orange has the capacity to cause harm, the [general] causation issue, but whether it did cause the harm and to whom")).

B.   *Dr. Clark's General Causation Opinions*

Dr. Clark was retained by O'Neill to identify the "substance at issue" that it is alleged caused his bladder cancer. In so doing, Dr. Clark identified three items in his initial expert report, subsequent deposition, and rebuttal report: (a) Benzene in the paint; (b) aromatic amines in the paint; or (c) the general chemicals found in paint. As explained during his deposition: "In this case the substantial factor — it is my belief that the chemicals in the paint and most likely the aromatic amines which are associated with the harden — the resin hardening which are the source of that aromatic amine which are likely possible. The benzene would contribute by damaging the immune system, so it would take less to have an effect for an individual."

1.   *Benzene*

Given that Dr. Clark ultimately ascribed benzene's role in this case to simply a contributing cause (juxtaposed to what he stated in his initial expert report), rather than a substantial contributing factor in O'Neill's development of bladder cancer, O'Neill's counsel (both during oral argument and in his opposition papers) has now disavowed consideration of that chemical as a causative agent for O'Neill's cancer and, just as importantly, as a basis upon which to admit his expert witnesses' testimony on causation. (Opp. at 10 n.10 ("the focus of Plaintiff's expert . . . testimony and this Opposition will be the [general] chemicals in the paint and the aromatic amines which are associated with the resin hardening two part epoxy paint system sold by . . . Sherwin-Williams and used by . . . O'Neill")). Accordingly, the Court finds that any expert testimony proffered by O'Neill's experts related to benzene in determining the cause of his cancer is not admissible under the second-

prong to the Daubert test as it is not relevant to any issues in dispute.

2. *Aromatic Amines*

Aromatic amines refers a large family of compounds made up of many specific, individual chemicals. Despite the size of the general chemical category, Dr. Clark has had trouble identifying which, if any, of these hundreds of aromatic amine chemicals was present in the Sherwin-Williams's epoxy paints and reducers used by O'Neill. In the end, the reason for this problem is because there were no such aromatic amine chemicals in the products used by O'Neill. Dr. Clark's efforts to avoid that fundamental conclusion by postulating how such compounds could be present under different scenarios are ultimately found by the Court as at odds with the evidence in the record.

Sherwin-Williams' Director of Corporate Regulatory Affairs, Elizabeth Gilbert, submitted an affidavit that identified the products O'Neill claims to have used in painting the floor of the restaurant during the time in question and then noted that "no compound within the class of chemicals known as aromatic amines was used as a raw material in manufacturing any of the products listed . . . at any time between 1997 and 2002." (Aff. Elizabeth Gilbert ¶¶ 3, 5).

Dr. Clark first seeks to work around this assertion by noting that it was his understanding that such aromatic amines are generally used in the industry as curing agents or hardeners for epoxy resin formulations. Because the Sherwin-William products in question utilize resin formulations, Dr. Clark stated that he began "with the supposition that Sherwin-Williams paints, epoxy paints are similar to others out there on the market and [therefore] . . . contain" aromatic amines as well. He elaborated that, if Sherwin-Williams "had come up with a different curing agent," they would have "specifically list[ed] it;" the failure to do so was surmised by Dr. Clark as indicating that the product was "consistent" with "the rest of the industry that uses aromatic amines as curing agents in their epoxy systems." Dr. Clark admitted that he was not "100 percent sure" if aromatic amines were present in the

5

products in question. His admission has proven prescient, as the assumption underlying his point has proven to be incorrect; what is used by most in the industry is not what is used by Sherwin-Williams.

This leads to consideration of the Material Safety Data Sheets ("MSDS") for the Sherwin-Williams products in question, which identify the raw chemical materials actually used therein. When asked if any aromatic amine chemical is listed as a raw material on the MSDS for the Sherwin-Williams' epoxy products in question, Dr. Clark identified two such chemicals he thought were aromatic amines — benzendimethanamine and tri(dimethylaminomethyl)phenol, explaining that the two chemicals were either aromatic amines in their own right "or could break down into aromatic amines."

As to the former assertion, Ms. Gilbert has proffered evidence that "neither chemical is an aromatic amine" because to be such a class of chemicals a "nitrogen atom must be attached directly to the aromatic compound," but in the case of the two chemicals in question the "amines are not attached directly to the aromatic compound." (Affidavit Elizabeth Gilbert ¶ 8). No evidence has been submitted by O'Neill to rebut this statement.

As to the latter assertion, Dr. Clark "speculated" that polyamines chemicals identified on the Sherwin-Williams products' MSDS "could form aromatic amines" by "coming in contact with aromatic hydrocarbons solvents." Dr. Clark admitted, however, that he could not identify a specific chemical reaction mechanism by which these admitted (non-aromatic amine) chemicals in the Sherwin-Williams products could breakdown to form aromatic amines. In short, Dr. Clark opines that there could be certain unidentified chemical reactions that could take place with the non-aromatic amines in the paint in question that would form aromatic amine, which it is opined could then cause bladder cancer. Ms. Gilbert again has pointed out that the reason Dr. Clark could not identify a chemical reaction mechanism is because none is present given the particular chemicals contained in the products in question.

Ms. Gilbert noted that the "breakdown when combined with certain solvents" theory advanced by Dr. Clark was misdirected, as the "aromatic hydrocarbon solvents" actually found in Sherwin-Williams products at issue "do not react with" the two chemicals in question. (Id. ¶ 10). Again no evidence has been proffered by O'Neill to rebut this statement.

Dr. Clark's final contention on the aromatic amines issue is that one cannot trust what was listed on the MSDS for the products in question because the MSDS does not provide "an exact composition of everything that's there."[3] As argued by O'Neill's counsel, "Defendant Sherwin Williams has failed with[] its MSDS to provide accurate analytical data of the composition of their products. . . . Moreover, Dr. Clark testified that aromatic amines that do not rise above the threshold value of .1 percent are not considered intentionally added ingredients and would not be listed on the MSDS in spite of the representations made by Elizabeth Gilbert . . . that no aromatic amines were used as a raw material in manufacturing any of the Sherwin Williams products Mr. O'Neill came into contact with during the painting process." (Opp. at 12) This theory, however, has also been refuted by Sherwin-Williams' representative, Ms. Gilbert, noting that her earlier assertion that no aromatic amines were used as a raw material in the products in question meant just that; no such chemicals were used "at any level, whether above or below the regulatory threshold value for MSDS reporting." (Affidavit Elizabeth Gilbert ¶ 8). Simply put, "aromatic amine compounds simply are not present in any of these products." (Id.).

O'Neill (as conceded by his counsel during oral argument) has proffered no evidence (other than the initial theories proffered by Dr. Clark, which have since been rebutted) to refute that proffered by Sherwin-Williams regarding the non-

---

[3] Interestingly, O'Neill's counsel later acknowledges in a separate section of his opposition that no "testing has . . . occurred . . . on Defendant Sherwin Williams' products." (Opp. at 21). In light of that concession, it is hard to fathom how Dr. Clark or plaintiff's counsel would have any basis to argue that the MSDS does not contain an "exact composition of everything that's there," much less engage in speculative hypothesis as to what was, in fact, in the product.

presence of aromatic amine chemicals in the products in question.

Because each of the theories advanced by Dr. Clark has been refuted by Sherwin-Williams without any rebuttal or even explanation by O'Neill, the Court concludes that no aromatic amine was contained in the Sherwin-Williams products at issue. Although O'Neill's counsel characterizes the current state of the record as one rife with "factual disputes" for a trier of fact to resolve at trial on whether aromatic amines are present, that is not how the evidence in this case has unfolded. All that O'Neill's counsel (through Dr. Clark) has put forward are speculative theories on how aromatic amines could have found themselves into the products in question, but each time the theory has not withstood the factual representations made by Ms. Gilbert that O'Neill (and Dr. Clark) has yet to attempt to rebut, refute, or otherwise explain so as to create a triable issue of fact. Given that O'Neill had no exposure to aromatic amines, Dr. Clark's causation opinion predicated upon the presence of such chemicals is not relevant to the facts at issue in this case; that is, his opinion is not relevant under the second prong of the Daubert test.

  c. *General Chemicals in Paint*

Dr. Clark's final opinion is based on the contention that epidemiological evidence exists showing a causal relationship between the use of "epoxy paint" containing "volatile chemicals" (in general) "employed in the painting profession," (Opp. at 17), and a statistically increased risk of developing bladder cancer. By comparing O'Neill to the "painters" that were the subject of the epidemiological studies to which he cites, Dr. Clark opines that O'Neill's exposure to the epoxy products by Sherwin-Williams over the five-year period in which he painted the floor in the restaurant could have led to his development of bladder cancer. Whatever problems there may or may not be with the admissibility of Dr. Clark's opinion as to the general causation linking the occupation of painter with the development of bladder cancer (the asserted defect being one of misplaced reliance on the epidemiological studies for the particular circumstances in this case), his ultimate

specific causation opinion flowing therefrom is defective as, again, it relies (as admitted by O'Neill's counsel at oral argument) on the presence of aromatic amines in the paint to tie the general theory of causation to the specific one concerning the products in question and O'Neill's cancer.

Dr. Clark's specific causation opinion (Dr. Dollinger never provided a specific causation opinion at to volatile chemicals in "paints" but only to "benzene" and "aromatic amines") is predicated on an analysis of chemicals <u>not found</u> in the products in question. Indeed, Clark's specific causation opinion is predicated entirely on aromatic amine chemical levels found in <u>other</u> companies' epoxy products, not that taken from the Sherwin-William products in question. (Opp. at 22-23 ("Dr. Clark further applied the United States Environmental Protection Agency's Wall Paint Exposure Model to MEKO, a chemical <u>typically</u> found in epoxy paint systems. . . . Although Sherwin Williams denies the use of MEKO as a raw ingredient in manufacturing the epoxy paint systems Mr. O'Neill used between 1997 and 2002, again Sherwin Williams' MSDS fail to list any different curing agent than those normally used within the industry as curing agents in epoxy systems") (emphasis added)). Namely, on two occasions Dr. Clark predicates his specific causation opinion on the levels of MEKO in the products (based entirely on the fact that such a chemical is generally present in epoxy paints, Dr. Clark labeling MEKO as a "signature chemical present in epoxy paint") even though Sherwin-Williams has repeatedly attested to the fact (and again it has not been refuted by Dr. Clark or O'Neill) that no such MEKO was in the products in question.[4]

---

[4] Moreover, the model Dr. Clark used to arrive at the level of such "exposure" (known as the WPEM) was based on a method utilized in arriving at exposure levels for "interior applications of alkyd and latex paints," a category which an epoxy paint does not fall within. Using the WPEM method to such a class of paints was specifically warned against by the EPA (who devised the method), stating "at present there is no basis for applying the algorithms to other types of paint products." Although Clark dismissed the admonition made by the EPA as little more than an attempt to cover their "rear-end," other than his <u>ipse dixit</u> that use of the method is appropriate for epoxy paints there is nothing in the

Thus, Dr. Clark's causation opinion with respect to paint in general is likewise inadmissible under the second-prong to Daubert.

C.  *Conclusion*

Accordingly, the Court **GRANTS** Sherwin-Williams' motion to exclude Dr. Clark's opinion, and given that Dr. Dollinger's opinion is confined solely to questions of specific causation that is entirely derivative of Dr. Clark's now-inadmissible general causation opinions (Mot. Exclude at 1 ("Dr. Clark, and only Dr. Clark is providing evidence on 'general causation.'  Dr. Dollinger has limited his role solely to issues of 'specific causation'")), his opinion is likewise excluded.  Having excluded both expert opinions proffered by O'Neill to establish a causal link between his cancer and the products in question manufactured by Sherwin-Williams, the Court **GRANTS** the motion for judgment as a matter of law in defendant's favor.

DATE: September 9, 2009

*S.G. Larson*

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

---

scientific literature to support such an application of the WPEM model.